**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>ARGOS THERAPEUTICS, INC.[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 18-____ (___) |

**DECLARATION OF MATTHEW FOSTER IN SUPPORT OF THE
DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

I, Matthew Foster, hereby declare as follows:

1. I am the Chief Restructuring Officer of Argos Therapeutics, Inc. ("Argos" or the "Company") the above captioned debtor and debtor-in-possession (the "Debtor"). I started providing advisory services to the Company in July 2018 and joined its management team as Chief Restructuring Officer in November 2018. In these capacities, I have become and am familiar with the Debtor's businesses, day-to-day operations and financial affairs.

2. On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 (the "Chapter 11 Case") of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended or modified, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court") and filed various motions described herein requesting certain relief in connection with the Chapter 11 Case (collectively, the "First Day Pleadings"). I submit this declaration (the "Declaration") in support of the Debtor's Chapter 11 Case and the First Day Pleadings.

3. Except as otherwise indicated herein, all statements set forth in this Declaration are based upon (a) my personal knowledge gained in my capacity as an officer of Argos; (b)

---

[1] The last four digits of the Debtor's federal tax identification number are 0007. The Debtor's corporate headquarters and mailing address is 4233 Technology Drive, Durham, NC 27704.

{1205.001-W0053101.}

information provided to me by other members of Argos' management team, including those under my supervision; (c) my review of relevant documents; and/or (d) my experience and knowledge of the Argos' operations and financial affairs. If called upon to testify, I could and would testify to the facts set forth in this Declaration.

4. Part I of this Declaration describes the Debtor's businesses, Part II describes the circumstances giving rise to the commencement of this Chapter 11 Case, Part III describes the Debtor's proposed course for this Chapter 11 Case, and Part IV sets forth certain facts in support of the First Day Pleadings.

## I.

## OVERVIEW OF THE DEBTOR'S BUSINESSES

*Business Operations*

5. Incorporated in the State of Delaware in 1997 and headquartered in Durham, North Carolina, Argos is an immuno-oncology company focused on the development and commercialization of individualized immunotherapies for the treatment of cancer and infectious diseases using its Arcelis® technology platform. Arcelis® is a precision immunotherapy technology that captures the spectrum of mutated (or neoantigens) and variant antigens that are specific to each patient's individual disease. Arcelis® was designed by Argos to overcome immunosuppression by enabling specifically targeted, durable memory T-cells without adjuvants that may be associated with toxicity. This platform technology is potentially applicable to the treatment of a wide range of different cancers and infectious diseases, and is specifically designed to overcome many of the manufacturing and commercialization challenges that have impeded other personalized immunotherapies.

6. Prior to the Petition Date, the Company's most advanced product candidate, rocapuldencel-T, was being evaluated in the ADAPT (as defined below) Phase 3 clinical trial for

the treatment of metastatic renal cell carcinoma (mRCC). In addition, rocapuldencel-T is being studied in Phase 2 investigator-initiated clinical trials as neoadjuvant therapy for renal cell carcinoma (RCC) and for the treatment of non-small cell lung cancer (NSCLC). Argos also has been developing a separate Arcelis®-based product candidate, AGS-004, for the treatment of human immunodeficiency virus (HIV), which is currently being evaluated in an investigator-initiated Phase 2 clinical trial aimed at HIV eradication in adult patients.

7. Because the Company's product candidates remain in the developmental stage, Argos' primary sources of revenues have traditionally derived from (a) third-party license agreements; (b) government entity sponsored grants; and (c) capital raising activities. During the year ending December 31, 2017, the Company recorded a net loss of approximately $40.6 million.

8. The Company currently employs three (3) employees as of the Petition Date.

*Capital Structure*

9. As of the Petition Date, the Debtor has outstanding debt obligations in the aggregate principal amount of $21 million, consisting of approximately (a) $6.6 million in secured first priority notes secured by a first priority lien on the Debtor's intellectual property; (b) $11.6 million in unsecured note obligations; and (c) $2.6 million owed to vendors, licensees and other unsecured creditors. As of the Petition Date, the Debtor is currently holding $4.3 million in cash and cash equivalents that is unencumbered by any security interest.

*Secured Debt*

10. On June 15, 2017, the Debtor entered into a note purchase agreement (the "Note Purchase Agreement") with Pharmstandard International, S.A. ("Pharmstandard"), pursuant to which the Debtor agreed to issue and sell to Pharmstandard that certain Secured Convertible

Promissory Note, dated as of June 21, 2017, in the original principal amount of $6.0 million (the "Pharmstandard Note"). As of the Petition Date, the amount outstanding under the Pharmstandard Note was approximately $6.6 million, including accrued but unpaid interest and fees.

11.  Under the Pharmstandard Note, the maturity date for the payment of principal and interest is June 21, 2022. The Pharmstandard Note bears interest at a rate of 9.5% per annum, which interest compounds annually. The Pharmstandard Note is secured by a lien on and security interest in all of the Debtor's intellectual property, pursuant to that certain Security Agreement by and between the Debtor and Pharmstandard, dated as of June 21, 2017 (the "Security Agreement"). The liens granted to Pharmstandard under the Security Agreement are limited to the Debtor's intellectual property and do not attach to any of the Debtor's other assets, including cash. The Debtor may prepay the Pharmstandard Note in whole or in part at any time without penalty or premium. Upon the occurrence of certain events of default, Pharmstandard will have the option to require the Debtor to repay the unpaid principal amount of the Pharmstandard Note and any unpaid accrued interest. As of the Petition Date, the Debtor was not in default under the terms of the Pharmstandard Note.[2]

*Unsecured Debt*

12.  As of the Petition Date, the Debtor estimates that its unsecured debt totals approximately $14.2 million, consisting of unsecured promissory notes, contractual license obligations and trade debt.

---

[2] Pharmstandard's conversion election is subject to certain conditions. Pharmstandard may convert the entire principal and interest on the Pharmstandard Note into shares of the Debtor's common stock at a price equal to $10.00 per share. To date, Pharmstandard has not converted any portion of the Pharmstandard Note to equity.

*Invetech Unsecured Note Obligation*

13. On September 22, 2017, as a resolution of certain contracted disputes with Invetech, the Debtor entered into a satisfaction and release agreement (the "Invetech Satisfaction and Release Agreement") with Invetech Pty Ltd ("Invetech"). Pursuant to the Invetech Satisfaction and Release Agreement, the Debtor agreed to make, issue and deliver to Invetech (a) a cash payment of $500,000; (b) 57,142 shares of common stock; and (c) that certain Convertible Promissory Note (the "Invetech Note") in the original principal amount of $5.2 million. The obligations of the Debtor evidenced in the Invetech Satisfaction and Release Agreement and Note represented the full satisfaction and release of all of the Debtor's payment obligations to Invetech arising under the Debtor's development agreement with Invetech prior to the date of the Invetech Satisfaction and Release Agreement, including the Debtor's obligation to pay Invetech up to a total of $8.3 million in deferred fees, bonus payments and accrued interest. As of the Petition Date, the amount outstanding under the Invetech Note was approximately $4.9 million, including accrued but unpaid interest.

*Saint Gobain Unsecured Note Obligation*

14. On November 22, 2017, the Debtor entered into a satisfaction and release agreement (the "Saint-Gobain Satisfaction and Release Agreement") with Saint-Gobain Performance Plastics Corporation ("Saint-Gobain") as a resolution of certain contracted disputes with Saint-Gobain. Under the Saint-Gobain Satisfaction and Release Agreement, the Debtor agreed to make, issue and deliver to Saint-Gobain (a) a cash payment of $500,000, (b) 34,499 shares of common stock, (c) that certain unsecured Convertible Promissory Note (the "Saint-Gobain Note" in the original principal amount of $2.4 million, and (d) certain specified equipment originally provided to the Debtor by Saint-Gobain under the development agreement

with Saint-Gobain, or the ("Saint-Gobain Development Agreement"). The obligations of the Debtor evidenced in the Saint-Gobain Note represented the full satisfaction and release of all of the Debtor's payment obligations to Saint-Gobain arising under the Saint-Gobain Development Agreement, prior to the date of the Saint-Gobain Satisfaction and Release Agreement, including certain development fees and charges. In connection with entering into the Saint-Gobain Satisfaction and Release Agreement, the Company and Saint-Gobain entered into an amendment to the Saint-Gobain Development Agreement to extend the term to December 31, 2019. As of the Petition Date, the unpaid principal balance under the Saint-Gobain Note is approximately $1.7 million, including accrued but unpaid interest.

*Medinet Unsecured Note Obligation*

15.     In December 2013, in connection with a license agreement with Medinet Co. Ltd. ("Medinet") for certain intellectual property of the Debtor in Japan, the Debtor borrowed $9.0 million pursuant to an unsecured Promissory Note (the "Medinet Note") that bears interest at a rate of 3.0% per annum. The principal and interest under the note are due and payable on December 31, 2018. Over the course of the license agreement with Medinet, the Debtor has achieved certain performance milestones that have entitled it to various reductions in the outstanding principal balance of the Medinet Note. As of the Petition Date, the unpaid principal balance under the Medinet Note is approximately $5 million. Under the terms of the license agreement with Medinet, if the Debtor fails to satisfy the Medinet Note in full by December 31, 2018, the Medinet Note will be extinguished and the Medinet License will convert to a fully-prepaid non-exclusive license. The Debtor intends to reject the Medinet License as of the Petition Date, which rejection the Debtor has determined in its reasonable business judgment is in the best interests of the Debtor's estate. Medinet will have an opportunity to make an election under

section 365(n) of the Bankruptcy Code upon such rejection, and Medinet will be deemed, absent any election, to have elected to retain its rights under section 365(n)(1)(B) of the Bankruptcy Code.

*Equity*

16.  The Debtor is a publicly traded company with 10,586,661 shares currently outstanding. Until April 23, 2018, the Debtor's shares were traded on the NASDAQ exchange. On April 23, 2018, the Debtor received a notification from NASDAQ the Company's common stock would be de-listed as of the open of business on April 25, 2018. Following such delisting, the Company transferred its common stock to the OTCQB® Venture Market.

## II.

### EVENTS LEADING TO THE CHAPTER 11 CASE

*ADAPT Trial Setback*

17.  Beginning in 2015, the Company conducted a pivotal Phase 3 clinical trial of rocapuldencel-T in combination with sunitinib/standard of care for the treatment of newly diagnosed metastatic renal cell carcinoma (the "ADAPT trial"). In February 2017, the independent data monitoring committee ("IDMC") for the ADAPT trial recommended that the trial be discontinued for futility based on its interim data analysis. The IDMC concluded that the trial was unlikely to demonstrate a statistically significant improvement in overall survival in the combination treatment arm, utilizing the intent-to-treat population at the pre-specified number of 290 events (deaths), the original primary endpoint of the study. Notwithstanding the IDMC's recommendation, following a meeting with the U.S. Food and Drug Administration (the "FDA"), the Company determined to continue the ADAPT trial until at least the pre-specified number of 290 events occurred, and to submit to the FDA a protocol amendment to increase the pre-specified number of events for the primary analysis of overall survival in the trial beyond 290

events. In April 2018, the Company submitted a protocol amendment to the FDA that included an amended primary endpoint analysis with four co-primary endpoints. Subsequently, the Company conducted another interim analysis of the data from the ADAPT trial, at which time 51 new events (deaths) had occurred subsequent to the February 2017 interim analysis. Based upon review of the interim data from this analysis, the Company determined to discontinue the ADAPT clinical trial as of April 2018. The Company does not expect to resume clinical development of rocapuldencel-T.

18. After termination of the ADAPT trial, and based on its review of the status of its internal programs, resources and capabilities, Argos has determined to explore a wide range of strategic alternatives including a potential merger or sale of the Company, among other potential alternatives that would have maximized both near and long-term value for all of Argos' stakeholders.

*Initial Marketing Process*

19. From April 18 through June 22, 2018, the Company, with the assistance of Stifel, Nicolaus & Company, Incorporated ("Stifel"), marketed itself to potential strategic partners interested in a reverse merger or other transaction, so as to utilize Argos' intellectual property and manufacturing capabilities as well as its position as a publicly traded entity. In particular, the Company and Stifel contacted thirty seven (37) parties all of which primarily had a focus on cell immunotherapy oncology approaches and/or were recognized contract development and manufacturing concerns. No viable transaction was achieved through this initial marketing process. Of the targets who declined to execute a transaction, the reasons given included one or more of the following principal concerns: general strategic fit, focus on their own products and

fundraising, desire to become public through a traditional IPO pathway, the Company's lack of NASDAQ listing and the Company's net cash position

*Subsequent Marketing Process and Selection of Stalking Horse Bidder*

20. On July 30, 2018, the Company engaged SSG Advisors, LLC ("SSG") to evaluate its operations and present strategic alternatives to the Company's board of directors. After analyzing its strategic alternatives, the Company tasked SSG with marketing its assets. SSG has prepared extensive marketing materials and began marketing the Company's assets in July 2018. In particular, from the time of its retention in July 2018 through the Petition Date, SSG contacted over forty-five (45) strategic parties in addition to the parties with existing non-disclosure agreements in an effort to sell the Company's assets. From that marketing process, three (3) parties engaged in discussions with the Company and received non-confidential information regarding an acquisition of the Company's assets and one (1) potential purchaser signed a non-disclosure agreement in order to receive information about the Company's facility and patent list.

21. After receiving and evaluating various proposals, the Debtor selected Cellscript, LLC as the stalking horse purchaser (the "Stalking Horse Purchaser") in connection with the Sale. On November 30, 2018, the Debtor and the Stalking Horse Purchaser entered into an asset purchase agreement (as amended, supplemented or modified, the "Asset Purchase Agreement"), a true and correct copy of which is attached to the Debtor's Bid Procedures and Sale Motion (as defined below). The Stalking Horse Purchaser has agreed to (i) purchase substantially all of the Debtor's equipment, intellectual property, and certain other assets (collectively, the "Assets"); (ii) assume certain of the Debtor's liabilities; and (3) assume certain of the Debtor's executory contracts, subject to higher or otherwise better bids. Among other things, as consideration for the purchase of the Debtor's Assets, the Stalking Horse Purchaser has agreed to (a) pay

$1,675,000.00 in cash; (b) pay cure costs for certain assumed executory contracts which are estimated to be valued at not less than $1,000; (c) assume certain of the Debtor's liabilities which are estimated to be valued at not less than $1,444,330; and (d) release (and/or assign to the Debtor's secured lender) the Stalking Horse Bidder's approximately $2,000,000 unsecured claim, which is estimated to be valued at not less than $700,000.

22. Under the Asset Purchase Agreement, the Debtor has also agreed to certain bid protections as an inducement to the Stalking Horse Purchaser to enter into the Asset Purchase Agreement. In particular, in the event that the Debtor enters into an agreement to sell or sells the Assets to a third-party bidder, the Debtor will (1) pay to the Stalking Horse Purchaser a break-up fee in the amount of $75,000 (the "Break-Up Fee") and (2) pay reimbursement of all reasonable, documented fees and expenses of the Stalking Horse Purchaser incurred in connection with the Stalking Horse Purchaser's efforts to negotiate and consummate the Sale, but such reimbursement shall be capped at $75,000 (the "Expense Reimbursement").

23. In order to facilitate the Sale, on the Petition Date, the Debtor filed the Bid Procedures and Sale Motion. Pursuant to the Bid Procedures, SSG will continue to market the Debtor's assets as well as solicit offers to acquire the Debtor's business as a going concern. The Debtor anticipates conducting an auction on or about January 22, 2019.

24. The Debtor believes, in the exercise of its business judgment, that the proposed Sale and auction structure will foster an open and competitive process and provide the best option to maximize value for all of its stakeholders. Indeed, given that the Debtor has a significant cash burn and no realistic opportunity to obtain financing from the public or private markets, the only alternative to the Sale would be conversion to Chapter 7 and liquidation. In the Debtor's view, Chapter 7 liquidation would be exceedingly value destructive and wasteful, as the Debtor would

immediately lose any remaining going concern value as it attempts to monetize its assets and distribute value to stakeholders.

### III.

### PROPOSED COURSE OF THE CHAPTER 11 CASE

25. The Debtor intends to pursue the Sale in Chapter 11 in order to obtain maximum value for the benefit of all of its stakeholders. The Debtor has access to unencumbered cash that will provide it with sufficient liquidity to operate during the Sale process, and the Stalking Horse Bid sets a floor price for what the Debtor hopes will be an open, competitive and ultimately successful auction of the Debtor's assets. Shortly after the Petition Date, the Debtor intends to propose a Chapter 11 plan of liquidation to provide for the orderly liquidation of any remaining assets after the Sale, and timely distributions to its stakeholders.

26. In order to achieve its goals in Chapter 11, the Debtor seeks the relief set forth in the First Day Motions, as summarized below.

### IV.

### FACTS IN SUPPORT OF FIRST DAY PLEADINGS[3]

27. To minimize the adverse effects of the commencement of this Chapter 11 Case on the Debtor's ability to effectuate a timely and efficient restructuring process that will preserve and maximize the value of the Debtor's estate, the Debtor has filed the following First Day Motions:

- Motion of the Debtor for Entry of an Order (A) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (B) Authorizing the Continued Use of Existing Cash Management System, and (C) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(b);

---

[3] Capitalized terms not defined within this Section IV shall have the meaning ascribed to such terms in the respective First Day Motions.

- Motion for Entry of an Order Authorizing the Debtor to Pay Prepetition Wages, Compensation, Employee Benefits, and Other Associated Obligations;

- Motion of the Debtor for Entry of Interim and Final Orders (a) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (b) Deeming Utilities Adequately Assured of Future Performance, and (c) Establishing Procedures for Determining Adequate Assurance of Payment;

- Motion of the Debtor for Authorization to Pay Certain Taxes and Related Obligations.

28. I have reviewed each of the First Day Motions, including any exhibits thereto, and incorporate by reference each of the factual statements set forth in the First Day Motions. I believe that the relief requested by the First Day Motions is necessary to enable to the Debtor to preserve and maximize value and efficiently implement its restructuring efforts with minimal disruption and delay.

## DECLARATION

29. Pursuant to section 1746 of title 28 of the United States Code, I declare under penalty of perjury that the foregoing is true and correct.

## RELIEF REQUESTED

30. I respectfully request that the Court grant all relief requested in the First Day Pleadings and such other and further relief as may be just and proper.

Dated: November 30, 2018    **ARGOS THERAPEUTICS, INC.**

_____
Matthew Foster
Chief Restructuring Officer